# In the United States Court of Federal Claims

No. 14-1053C

(E-Filed:  February 18, 2015)[1]

| | |
|---|---|
| QBE, LLC, | ) |
| | ) |
| | ) Pre-Award Bid Protest; Cross-Motions |
| Plaintiff, | ) for Judgment on the Administrative |
| | ) Record; Challenge to Offeror's |
| v. | ) Exclusion from the Competitive |
| | ) Range; Technical Proposal Evaluation |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

John R. Tolle, McLean, VA, for plaintiff.

Christopher L. Harlow, with whom were Joyce R. Branda, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  James P. Leary, Trial Attorney, Contract & Fiscal Law Division, United States Army Legal Services Agency, Fort Belvoir, VA, of counsel.

---

[1]     This Opinion was filed under seal on January 30, 2015, ECF No. 27, at which time the parties were given an opportunity to request redactions of any protected information. Defendant requests several redactions in order to protect "procurement-sensitive information that could prejudice the integrity of the ongoing procurement," to include "the total number of offerors responding to the solicitation and the total number of offerors in the competitive range, along with the relative standing of these offerors." Def.'s Mot. for Redactions, ECF No. 29, at 1.  Plaintiff requests only that the identity of its project manager be redacted as propriety information.  See Pl.'s Mot. for Redactions, ECF No. 31, at1; cf. infra note 17 (identifying QBE's project manager).  Both parties' motions are **GRANTED**.

        Redacted material is indicated as follows, XXX, with the redaction equal in length to the text or numbers redacted.  With the exception of the row dedicated to QBE, the court has also redacted information from the table that summarizes the ratings assigned and total evaluated price for each offeror's proposal.  See infra Part I.B (table); cf. Def.'s Mot. for Redactions 1 (requesting that the number of rows in this table be redacted "so that the number of competitors cannot be inferred from the size of the table").

OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This is a pre-award bid protest filed by QBE, LLC (QBE or plaintiff). QBE challenges its exclusion from the competitive range under a solicitation for the procurement of information technology (IT) services by the U.S. Department of the Army, Army Contracting Command – Rock Island (the Army, Agency, or government). See Compl., ECF No. 1, ¶¶ 1, 7, 38. The parties submitted cross-motions for judgment on the administrative record (AR) in accordance with United States Court of Federal Claims Rule (RCFC) 52.1(c).[2] See Pl.'s Mot. J. AR (Pl.'s Mot.), ECF No. 18; Def.'s Mot. J. AR (Def.'s Mot.), ECF No. 19. The court held oral argument on the parties' cross-motions on January 5, 2015. See Tr., ECF No. 26 (transcript of the digitally recorded proceeding). The Agency has agreed to postpone the award of the contract(s) until the resolution of QBE's protest. Def.'s Mot. 2, 18.

For the reasons explained below, the court finds that the Agency had a rational basis for excluding QBE from the competitive range. Accordingly, plaintiff's motion is **DENIED**, and defendant's motion is **GRANTED**.

I.      Background

        A.      The Solicitation

On January 17, 2013, the Army issued Solicitation No. W52P1J-12-R-0201 (the Solicitation), which was subsequently amended twenty-five times, for the procurement of Enterprise Information Technology Services (EITS) in support of the Program Manager Installation Information Infrastructure Communications and Capabilities (PM I3C2). AR 1–2 (Solicitation); see AR 1406–07 (Competitive Range Determination (CRD)) (providing that the Solicitation was issued on January 17, 2013 and identifying amendments). "[]PM I3C2[] provides a comprehensive approach to U.S. Army information technology initiatives," by, inter alia, "employ[ing] a synchronized effort to modernize the Army's information networks, outside cable plants, telephone switching systems, campus area networks and long haul gateway for Army installations [worldwide]." AR 478 (Performance Work Statement (PWS)). The Solicitation seeks project-management and related support for the following PM I3C2 Program Management Offices (PMOs): the Installation Information Infrastructure Modernization Program (I3MP), the Power Projection Enablers (P2E), and the Republic of Korea (ROK). Id.; see AR 1470 (Source Selection Plan (SSP)).

_____

[2]     The government filed the administrative record (AR) under seal on November 10, 2014 in the form of a CD-ROM. See Def.'s Notice of Filing AR, ECF No. 17.

The Solicitation contemplates the award of three Indefinite Delivery Indefinite Quantity (IDIQ) contracts to small businesses as set-asides but reserves for the Agency the right to make more or less than three awards.  AR 791 (Amendment 0022).[3]  The Solicitation advises that the Agency intends to make the awards "after conducting discussions with Offerors determined to be within the competitive range," and that "[t]he contracting officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals."  Id.

The offeror(s) whose proposals conform to the requirements of the Solicitation and represent the "best value" to the Agency will be awarded contracts under the Solicitation.  AR 802.  The Solicitation provides that the best value determination will be based on "an integrated assessment" of four evaluation factors in descending order of importance—Technical, Past Performance, Management, and Price.  Id.  "The non-price Factors combined are significantly more important than the Total Evaluated Price Factor.  However, as non-price factors equalize, price becomes more important in the best value analysis."  Id.; see also Fed. Acquisition Reg. (FAR) 15.101-1 (2014) (describing the "tradeoff process").  A proposal receiving less than an Acceptable rating in either the Technical or Management Factors will not be considered eligible for award.  AR 802.

Section L of the Solicitation details the instructions and conditions for submission of proposals, AR 791–800, and advises that proposals will be assessed based on the four evaluation factors, AR 791.  Offerors are instructed to submit a proposal for each evaluation factor.  AR 793. Only QBE's Technical Proposal is at issue here.  Cf. infra Part III.B (finding it unnecessary to address plaintiff's challenge to the Agency's evaluation of its Management Proposal).

The Solicitation instructs offerors to organize their technical proposals into two sections, respectively designated as Sub-Factor 1 and Sub-Factor 2, with an overall page limitation of thirty-five pages.  AR 794–96.  For Sub-Factor 1, offerors are instructed to describe their technical understanding of the EITS Performance Work Statement (PWS) by addressing (1) their understanding of the services framework model employed by PMs I3C2, P2E, and I3MP; (2) their approach and methodology; (3) their implementation strategy; and (4) their coordination plans.  AR 795.  For Sub-Factor 2, offerors are instructed to describe their technical approach to the Sample Task Order by addressing

---

[3]      Amendment 0022 to the Solicitation was issued on June 25, 2014.  See AR 1407 (Competitive Range Determination (CRD)) (listing date).  "Offerors were advised to submit revised proposals based on Amendment 0022."  AR 1409–10.  The court understands that QBE's final revised proposal, which was submitted on July 18, 2014, is based on the instructions set forth in Amendment 0022, see id.; AR 1197–1375 (QBE's Final Proposal), and the court therefore cites principally to this part of the Solicitation, see AR 789–807.

(1) their approach and methodology; (2) their implementation strategy; and (3) their coordination plans.  AR 795–96.

Section M of the Solicitation, addressing the evaluation process, AR 802–07, advises that the Agency will assess the offerors' technical proposals "to determine the extent that the offeror understands the Government's requirements, the technical quality of the proposed approach, and the offeror[s'] ability to fulfill the EITS requirements of the [PWS]," AR 803.  The Agency's evaluation "will include examination of [their] proposed technical plan[s], knowledge of Army requirements, and application of industry standards and best practices."  Id.  This evaluation is to be further informed by whether each proposal (1) demonstrates "a clear an understanding of the problems to be solved and the requirements to be satisfied," (2) "adequately and completely considers, defines, and satisfies the EITS IDIQ PWS and other [Solicitation] requirements," or merely offers "statements of compliance or repetition of the requirements without a complete discussion and analysis;" and (3) evidences "[f]lexibility"—that is, "the ability to meet changing requirements in the dynamic environment of Army programs."  Id.

The Source Selection Plan (SSP) identifies and defines the adjectival ratings by which the Source Selection Evaluation Board (SSEB) is to rate the offerors' technical proposals:

| Adjectival Rating | Definition |
|---|---|
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  Strengths far outweigh any weaknesses.  Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements.  Proposal contains strengths which outweigh any weaknesses.  Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Strengths and weaknesses are offsetting or will have little or no impact on contract performance.  Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements.  The proposal has one or more weaknesses which are not offset by strengths.  Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies.  Proposal is unawardable. |

4

AR 1480–81 (SSP) (emphasis added); accord AR 110–11 (Solicitation).  As is relevant here, a "deficiency" is defined as "a material failure of the proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful performance to an unacceptable level."  AR 1482; accord FAR 15.001.

B.      Evaluations and the Competitive Range Determination

XXX offerors submitted proposals in response to the Solicitation.[4]  AR 1408 (CRD).  In order to protect source selection information, the XXX offerors were identified with the following alphanumeric indicators:  XXX.[5]  Id.

The SSEB evaluated the Technical, Management, Past Performance, and Price Factors of each proposal.  See AR 1409–10.  A summary of the ratings assigned and the total evaluated price for each offeror's proposal is below:

|  | Technical (Overall) | Sub-factor 1 | Sub-factor 2 | Past Performance | Management (Overall) | Sub-factor 1 | Sub-factor 2 | Sub-factor 3 | Price |
|---|---|---|---|---|---|---|---|---|---|
| C1 | Unacceptable | U | U | Substantial Confidence | Marginal | G | G | M | XXX |

Id.

On September 8, 2014, the contracting officer issued the competitive range determination, AR 1405, which was approved by the Source Selection Authority (SSA), AR 1431; cf. AR 1452 (Acquisition Plan) (providing that the SSA "approve[s] the Contracting Officer's competitive range decision and . . . make[s] the final source selection decision").  The contracting officer evaluated the XXX proposals pursuant to FAR 15.306(c) and the instructions set forth in Sections L and M of the Solicitation, AR 791–800, 802–07, and took into account the findings of the SSEB to determine the highest-rated offerors to include in the competitive range, AR 1410.  The contracting officer ultimately chose XXX to be included in the competitive range—XXX.  AR 1410.

QBE, which was assigned the C1 indicator, was excluded from the competitive range along with XXX.  Id.  The contracting officer determined that these offerors'

---

[4]      QBE submitted its initial proposal in response to the Solicitation on November 13, 2013.  AR 855–1050 (QBE's initial proposal).  QBE submitted revised proposals on May 27, 2014 and July 18, 2014 that addressed certain amendments to the Solicitation.  AR 1051–1196 (QBE's second proposal); AR 1197–1375 (QBE's third and final proposal).

[5]      XXX.  AR 1408 (Source Selection Plan (SSP)).

proposals contained "numerous deficiencies" and required "major revisions" to be eligible for award. Id.

Plaintiff contends that the Agency's exclusion of QBE from the competitive range was based on an improper evaluation of QBE's Technical Proposal. See Pl.'s Mot. 1–2, 36–37. The court addresses plaintiff's argument in more detail below.

II.   Legal Standards

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract." 28 U.S.C. § 1491(b)(1) (2012).

The court reviews an agency's procurement decision to determine whether the decision is supported by the administrative record. See RCFC 52.1. The Administrative Procedure Act (APA) standard of review applies to the court's examination of an agency's decision. See 28 U.S.C. § 1491(b)(4). In accordance with this standard, the court will set aside a decision by the agency only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012). Application of the arbitrary and capricious standard is "highly deferential," Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and the court will set aside an agency decision only if "(1) the procurement official's decision lacked a rational basis, or (2) the procurement procedure involved a violation of regulation or procedure," Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001).

To surpass the threshold of arbitrary and capricious, an agency's decision need only have been "the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n.8 (2002) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)), aff'd, 56 F. App'x 474 (Fed. Cir. 2003); see Pitney Bowes Gov't Solutions, Inc. v. United States (Pitney), 94 Fed. Cl. 1, 11 (2010) ("Mindful of its role on review, the court will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation." (internal quotation marks omitted)). The court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co. (Motor Vehicle Mfrs. Ass'n), 463 U.S. 29, 43 (1983). A protestor thus "bears a heavy burden" in attempting to establish that an agency's decision lacked a rational basis, Impresa, 238 F.3d at 1333 (internal quotation marks omitted), and a protestor's "mere disagreement[]" with a contracting officer's evaluation of its technical proposal "is not nearly enough" to establish that the contracting officer's decision was arbitrary or capricious, CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 717 (2011), aff'd, 475 F. App'x 341 (Fed. Cir. 2012).

In a negotiated procurement like the one at issue here, see AR 1454 (Acquisition Plan), a protestor's burden is even greater because "the contracting officer is entrusted with a relatively high degree of discretion," Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (internal quotation marks omitted). "[T]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious." Burroughs Corp. v. United States, 617 F.2d 590, 597 (Ct. Cl. 1980).

Moreover, contracting officers have particularly "broad discretion in determining [the] competitive range, and such decisions are not disturbed unless clearly unreasonable." Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d 970, 973 (Fed. Cir. 1993). For example, Federal Acquisition Regulation 15.306(c)(2) provides that a "contracting office may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals."[6]

Further, "to prevail in a bid protest[,] the protester must show not only a significant error in the procurement process, but also that the error prejudiced [the protestor]." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). The Federal Circuit has directed that prejudice in a pre-award bid protest context means that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." Id.

III.   Discussion

---

[6]   As plaintiff correctly observes, see Pl.'s Mot. 15, this court has interpreted FAR 15.306(c) as requiring close scrutiny of an Agency's decision to limit the competitive range to only one offeror, see, e.g., L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 651 (2008); Chapman Law Firm Co. v. United States, 71 Fed. Cl. 124, 132 (2006), aff'd in relevant part, 490 F.2d 934, 938 (Fed. Cir. 2007). However, close scrutiny of the contracting officer's competitive range determination is not required where, as here, the Agency has established a competitive range of XXX, AR 1410 (CRD), in a Solicitation that contemplates awarding three contracts (but reserves for the Agency the right to make more or less than three awards), AR 791 (Amendment 0022).

A.      The Technical Factor[7]

The SSEB rated QBE's Technical Sub-Factors 1 and 2 as Unacceptable, and, based on these ratings, rated QBE's overall Technical Proposal as Unacceptable.  The SSEB summarized the basis for this Unacceptable rating as follows:

> [QBE's Technical] Proposal <u>did not demonstrate an adequate understanding</u> of the services framework in support of PM I3C2, P2E, I3MP, and ROK <u>and provided insufficient value</u> to justify how the offeror would implement [the] technical section to the framework.   [QBE's Technical] Proposal failed to address all technical sections of sub-factors in Section M and did not meet the requirements of several sections of I3C2 PWS and [the Sample Task Order].

AR 1380 (SSEB Tech. Eval.) (emphasis added).  In total, the SSEB found three strengths, two weaknesses, and four deficiencies in QBE's Technical Proposal.  AR 1380–83.  A chart summarizing the relevant findings of the SSEB is set forth below:

---

[7]      The relevant sections of QBE's initial Technical Proposal and third (and final) Technical Proposal are nearly identical.  <u>Compare</u> AR 862–92 (excerpt of QBE's Initial Proposal), <u>with</u> AR 1206–36 (excerpt of QBE's Final Proposal); <u>cf.</u> AR 1223 (adding a reference to "Figure 2" in the Implementation Strategy section).  For ease of reference, the court cites to QBE's final Technical Proposal, submitted July 18, 2014—the proposal upon which the contracting officer based her exclusion of QBE from the competitive range, <u>see</u> AR 1432–33 (QBE's exclusion) (dated Sept. 8, 2014), rather than QBE's initial proposal, dated November 13, 2013—the proposal upon which the SSEB based its Technical Evaluation findings, <u>see</u> AR 1380 (SSEB Tech. Eval.) (dated Feb. 27, 2014).  Both parties also cite to QBE's final proposal in their briefing.

Because the relevant portions of QBE's initial and final Technical Proposals are substantially identical, any differences in the various versions of the Performance Work Statement on which QBE relied in preparing its proposals do not bear on the court's resolution of the instant matter.  <u>Cf.</u> Pl.'s Resp. 2–3 (observing that defendant's briefing cites to earlier versions of the PWS).

| Evaluation Factor | Title of Factor | Rating | Strengths, Weaknesses, Significant Weaknesses, Deficiencies |
|---|---|---|---|
| Sub-Factor 1 | Understanding of EITS IDIQ PWS | Unacceptable | |
| Sub-Factor 1a | Services Framework Model | | 1 strength, 1 weakness |
| Sub-Factor 1b | Approach and Methodology | | 2 strengths, 1 weakness, 1 deficiency |
| Sub-Factor 1c | Implementation Strategy | | 1 deficiency |
| Sub-Factor 1d | Coordination and Planning | | 1 deficiency |
| Sub-Factor 2 | Sample Task Order Approach | Unacceptable | |
| Sub-Factor 2a | Approach and Methodology | | |
| Sub-Factor 2b | Implementation Strategy | | 1 deficiency |
| Sub-Factor 2c | Coordination and Planning | | |

Id.

In turn, the contracting officer relied on the SSEB's findings to make her competitive range determination, AR 1410, concluding, in relevant part, that QBE had failed to "demonstrate a clear understanding of what is necessary to meet the technical requirements of the IDIQ PWS and the Sample [Task Order]," AR 1421.  The contracting officer further found that "the magnitude of the deficiencies cited in the [SSEB's] technical report would require major revisions to [QBE's] proposal and it is unlikely [the various deficiencies] could be corrected through discussions."  AR 1420; see also AR 1421 ("Major revisions would be required to [QBE's] Technical volume for [its] proposal to be awardable.").  Accordingly, the contracting officer excluded QBE from the competitive range.  AR 1410.

Plaintiff argues that the Agency improperly evaluated QBE's Technical Proposal. See, generally, Pl.'s Mot. 16–30.  Specifically, plaintiff contends that none of the identified deficiencies or weaknesses were justified.[8]  Pl.'s Mot. 27, 30.  Absent these deficiencies and weaknesses, plaintiff contends that it would have received an Outstanding rating under Sub-Factor 1 and either an Acceptable or Good rating under Sub-Factor 2.  Id. at 30.  Thus, plaintiff argues, QBE's overall Technical Proposal should

---

[8]     The court does not address the two weaknesses assigned to QBE's Technical Proposal because it was the four identified deficiencies that prompted the Agency to exclude QBE from the competitive range.  See AR 1421 (CRD) (stating that given "the magnitude of the deficiencies" identified in QBE's Technical Proposal, QBE's proposal "would require major revisions" that were "unlikely . . . [to] be corrected through discussions").  That is, even if the court accepted plaintiff's argument that the weaknesses associated with Technical Sub-Factors 1a and 1b were unwarranted, plaintiff could not demonstrate prejudice.

have been rated as Outstanding, and QBE should have been included in the competitive range.  Id. at 30, 36–37.

During oral argument, plaintiff's counsel suggested that the primary issue before the court is whether the four identified deficiencies amount to "material failure[s] . . . to meet a Government requirement."  Tr. 46:6–7; see also Tr. 44:17–21 (Pl.'s Counsel) ("Was this a requirement?  Was it a requirement that rises to the level [of] a material failure . . . ?  I think that's what a lot of this case boils down to . . . .").  As discussed above, the Source Selection Plan defines "deficiency" as "a material failure of the proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful performance to an unacceptable level."  AR 1482; accord FAR 15.001 (same).  Plaintiff argues that "the requirements that the Agency stated QBE failed to meet or address in its [Technical] [P]roposal . . . were not called out in the Solicitation as beings ones for which its proposal would be found unacceptable for failing to meet."  Pl.'s Mot. 17.  And, according to plaintiff, this court "has not permitted proposals to be excluded from the competition for failure to meet a mandatory requirement unless the requirement is clearly stated in the [solicitation.]"  Id. (citing Mantech Telecommc'ns & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 67 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002) ("A mandatory minimum requirement must be clearly identified as such within the solicitation so as to put offerors on notice of the serious consequences of failing to meet the requirement." (internal quotation marks omitted)); see also Tr. 14:22–15:2 (Pl.'s Counsel) (addressing same).

However, the court agrees with defendant's observation that although QBE's Technical Proposal "adequately describ[ed] big picture ideas," it failed to "set[] forth the technical details necessary to accomplish the specific mission contemplated by the [Solicitation]."  Def.'s Mot. 9 (citing AR 1380–81 (SSEB Tech. Eval.)); see also Tr. 18:6–9 (Def.'s Counsel) ("QBE's proposal was really nothing more than a boilerplate information technology proposal that had really almost nothing to do with the I3C2 framework or any of the subordinate networks.").

As set forth below, the record supports the Agency's determination that QBE's Technical Proposal failed to adequately convey QBE's understanding of the entire PM I3C2 framework.  The court finds that the Agency's identification of each of the four technical deficiencies was reasonable and consistent with the Solicitation's stated requirements and evaluation criteria.  See Pitney, 94 Fed. Cl. at 11 ("Mindful of its role on review, the court will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation." (internal quotation marks omitted)).  The court also finds that the Agency reasonably determined that at least three of these deficiencies could not be cured absent major revisions to QBE's Technical Proposal.  See infra Parts III.A.1.b–c & III.A.2.a (addressing Sub-Factors 1c, 1d, and 2b).  Because QBE failed to adequately demonstrate a clear understanding of the technical requirements of the

Solicitation, the court concludes that the Agency reasonably rated QBE's Technical Proposal as Unacceptable and properly excluded QBE from the competitive range.  The court reviews, in turn, each identified deficiency in QBE's Technical Proposal.[9]

      1.      Technical Sub-Factor 1 – Understanding of the EITS PWS

          a.      Sub-Factor 1b – Approach and Methodology

Section L of the Solicitation instructs offerors to describe their approach and methodology under Sub-Factor 1b.  AR 795.  The Solicitation specifically instructs offerors as follows:  "Describe your technical approach and methodology to meeting PWS task area elements within the given constraints and other requirements."  Id. Section M of the Solicitation sets forth the process by which the Agency intends to evaluate Sub-Factor 1b, and states as follows:

> The technical approach to the EITS will be evaluated to determine whether the offeror has proposed a complete, logical, well-defined and meaningful approach with clear methods and procedures that will successfully accomplish the requirements with the least risk.  The proposal shall address the EITS IDIQ PWS in sufficient detail to demonstrate a clear understanding of all tasks required**.**

AR 803 (emphasis added).

In its evaluation of QBE's Sub-Factor 1b, which is addressed in section 1.2 of QBE's proposal, see AR 1208–23, the SSEB concluded, overall, that QBE "failed to address the clear process to approach and methodology of each individual technical section to analyze successful accomplishment with the least risk," AR 1381 (citing six PWS sections insufficiently addressed).  The SSEB identified two strengths, one weakness, and one deficiency in this section of QBE's proposal.  AR 1381–82.  As to the identified strengths, the SSEB credited QBE for its "detailed area[s] of specialties" and its discussion of several other PWS technical support tasks.  See AR 1381.  As a weakness, the SSEB pointed to the Knowledge Management Support section of QBE's proposal, which states, in full:  "Knowledge management is the full life-cycle management of a database with a web portal front-end and includes managing access control, integration with enterprise army systems (i.e. small and AD), training/supporting users, and maintaining an optimal [knowledge management] technology/process architecture."  AR 1212.  The SSEB found that although QBE correctly defined the

---

[9]      The court need only determine that one of the identified deficiencies was justified for plaintiff to lose on its motion for judgment on the administrative record.  Cf. Tr. 19:20–24 (Def.'s Counsel) ("I think we're in agreement that all four of those deficiencies would need to be shown to be unreasonable for QBE to [prevail].").  However, for the sake of completeness, the court addresses each deficiency in turn.

concept of knowledge management and mentioned knowledge management tools in other sections of its Technical Proposal, it considered as a weakness QBE's failure to adequately describe how it would apply its own expertise in knowledge management to the I3C2 framework.  See AR 1382.

The Knowledge Management section of QBE's proposal is also relevant to the SSEB's identified deficiency for Sub-Factor 1b.  The SSEB considered as a deficiency QBE's failure to adequately address its approach to developing and operating a database for the management of technical data:  "[Although QBE] offered to 'create, maintain, and operate an automated repository' in [the] Technical Data Management Support section of the proposal, [it] did not address this requirement in [the] Knowledge Management Support [section]."[10]  Id. (internal citations omitted); cf. AR 503 (PWS) (requiring successful offerors to "create, maintain, and operate an automated repository to assist I3C2 in acquiring, storing, maintaining, protecting, sharing and accessing program data" as part of the technical data management requirement).

The court observes that the SSEB's articulation of this deficiency is not a model of clarity.  During oral argument, defendant's counsel attempted to shed light on this identified deficiency by explaining that the SSEB "found [a] reference to an access control database," in the Knowledge Management Support section of QBE's proposal, which, according to defendant, was "close enough to be [the automated] repository database that [the SSEB] was looking for."[11]  Tr. 32:3–6; see also Tr. 33:22–24 (Def.'s Counsel) (claiming that the although the SSEB gave QBE "credit for at least discussing an access-controlled database," it ultimately "found that [QBE] didn't go far enough"); cf. AR 1212 (QBE's Proposal) (stating that "[k]nowledge management is the full life-

---

[10]    Defendant's counsel explained the relationship between knowledge management, technical data management, and configuration management as follows:

> Sort of the way I look at it is knowledge management is a big circle of ideas and tasks and things that need to be done.  Within that [are] a myriad of smaller circles.  One of which is configuration management, [and] one of which is technical data management.  Those two are sort of like Venn diagrams.  They overlap a little bit.  You're going to get a little bit of a configuration management, tech management and vice versa, and you're going to get a little bit of knowledge management in both of those.

Tr. 32:15–24 (Def.'s Counsel); cf. Tr. 9:11–15 (Pl.'s Counsel) (stating that configuration management "is roughly interchangeable with . . . knowledge management," and that "one doesn't go without the other").

[11]    Defendant's counsel further explained that "this automated repository" refers to the management of "back[-]office data," such as emails and voicemails.  Tr. 33:13–20.

cycle management of a database . . . [that] includes managing access control"). However, the court is unable to discern any support in the SSEB's evaluation of Sub-Factor 1b for the view defendant presented during oral argument. See AR 1382 (SSEB Tech. Eval.).

Further complicating matters is plaintiff's contention that QBE addressed this automated repository requirement in the Configuration Management section of its proposal. See Pl.'s Mot. 24 (arguing that QBE employed an "integrated approach" to discussing this technical data management requirement). Plaintiff claims that certain language in the Technical Data Management Support section of QBE's proposal refers the evaluator to its Configuration Management section. Id. at 23–24. The language to which plaintiff refers states: "Our administrative staff will apply change and configuration management techniques to achieve consistency and accuracy across all administrative documents . . . ." AR 1219 (QBE's Proposal). And, according to plaintiff, the Configuration Management section of QBE's proposal "is fully compliant with Section L instructions, and provides an extensive response to the [technical data management] requirement." Pl.'s Mot. 24.

Regardless of where in its proposal QBE allegedly addressed the automated repository requirement, it is clear that the SSEB determined that QBE failed to do so in sufficient detail. See AR 1382 (SSEB Tech. Eval.); Tr. 22:10–14 (Def.'s Counsel) (stating that the Agency penalized QBE not for taking an alleged "integrated approach" to discussing certain ideas but, rather, "for not discussing them with the level of detail that would be necessary for this to be a successful proposal"). The SSEB faulted QBE for failing to adequately explain its approach to "creat[ing], maintain[ing], and operat[ing] an automated repository," AR 1382 (internal quotation marks omitted), a determination that the court finds reasonable based on the record before it, see Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (stating that the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). Plaintiff's blanket citation to the Configuration Management section of QBE's proposal does not persuade the court otherwise. The Solicitation instructed offerors to address the PWS requirements "in sufficient detail to demonstrate a clear understanding of all tasks." AR 803 (emphasis added). QBE failed to do so. Accordingly, the court finds reasonable the Agency's identified deficiency for Sub-Factor 1b.

b.     Sub-Factor 1c – Implementation Strategy

Section L of the Solicitation instructs offerors to describe their implementation strategy under Sub-Factor 1c. AR 795. The Solicitation instructs offerors as follows: "Describe your approach for implementing your performance of the contract." Id. Section M of the Solicitation sets forth the process by which Agency intends to evaluate Sub-Factor 1c and provides: "The offeror should demonstrate understanding of mission, corporate, and office requirements related to the implementation of capabilities. The offeror shall demonstrate that it possesses a realistic approach and implementation

strategy for meeting or exceeding the EITS IDIQ PWS requirements with low risk to the Government." AR 803.

In its evaluation of section 1.3 of QBE's proposal, which addressed QBE's implementation strategy, AR 1223, the SSEB identified as a deficiency QBE's failure to "clearly identify any implementation strategy," AR 1382. The SSEB explained:

> [QBE's p]roposal had no proper disciplined strategy to implement the program at all[.] [QBE] failed to offer any synchronized step-by-step coordination between the implement[ation] strategy and described approach and methodology. [QBE] does not show via either an IMS or other document/visualization how they intend to meet timelines to get ramped up to support the PM. There is no plan with this document.

Id. (citation omitted) (emphasis added). The contracting officer's competitive range determination was significantly influenced by most of these findings. See AR 1419; cf. AR 1410 (stating that "only those SSEB evaluation findings that significantly influenced [the contracting officer']s competitive range determination are discussed").

Section 1.3 of QBE's proposal provides, in full:

> The Government requires a transition that achieves the maximum value, while introducing minimal risk to sustainment of existing and upcoming service requirements. Our converged approach for acquisition oriented program management (Figure 2) requires no modification to be integrated into existing programs without disruption. It can be run in parallel with the current framework to handle new acquisitions without slowing down existing ones. It provides an optimal framework that can be used to control and measure accelerated delivery of products, achieving timely results.

> We have personnel currently working on related programs within key mission areas such as Kuwait, Afghanistan, Germany, Korea, Hawaii, Fort Huachuca, and Fort Belvoir. Our current SME staff spans the engineering, architectural, and programmatic skill sets required to support each of the ITIL process areas and to address specific Program requirements such as Project/Product Management, BPR, Enterprise Design and IT Support, ILS, and General Program Services. This background, and direct experience with I3C2 and its subordinate commands (PM P2E, I3MP, and I3C2-P) substantially reduce the risk to implementation for [QBE].

> In support of this IDIQ contract, our initial focus will consist of establishing our PMO within 2 weeks of award to meet onsite with Government representation. We will provide surge resources to support our Program Manager and meet with all relevant stakeholders to establish a

working relationship, understanding of expectations, definition of success
metrics, and to collect all initial data. Our PMO will develop an initial PMP
and Quality Control Plan (QCP), and work with corporate structures to
quickly expand the human resources, FSO, IT, engineering, proposal, and
financial system and process structures necessary to support the PMO and
all new requirements. Using this proactive approach, our team will be well
prepared to support ongoing reporting and financial obligations associated
with the IDIQ, and to quickly respond to all TO requirements with minimal
risk to the Government.

AR 1223.

Plaintiff first takes issue with the Agency's observation that "QBE's proposal does
not show via either an IMS or other document/visualization how [QBE] intend[s] to meet
timelines to get ramped up to support the PM." Pl.'s Mot. 25 (citing AR 1419 (CRD));
AR 1382 (SSEB Tech. Eval.) (observing same). Plaintiff argues that neither the
Solicitation nor the PWS effectively describe the required timeline, and that, in any event,
section 1.3 of QBE's proposal clearly provides a timeline. Pl.'s Mot. 25.[12]

---

[12]     Plaintiff further contends that the Agency's reference to "an IMS or other
document/visualization" suggests that the Agency was erroneously applying the
instructions for Sub-Factor 2c. Pl.'s Mot. 25 (referencing AR 1382 (SSEB Tech. Eval));
cf. AR 796 (Sub-Factor 2c to Amendment 0022) (instructing offerors to "[p]rovide a
Work Breakdown Structure (WBS), WBS Dictionary, and Integrated Master Schedule
(IMS) for the Sample Task Order"). Defendant explains that the Agency was simply
offering "constructive feedback" by identifying "'an IMS or other
document/visualization'" as a "possible way[]of satisfying the [Solicitation's]
requirements," see Def.'s Resp., ECF No. 20, at 8 (referencing AR 1382 (SSEB Tech.
Eval)), an explanation the court finds to be persuasive.

Moreover, even if the Agency had erroneously applied the instructions for Sub-
Factor 2c to Sub-Factor 1c of QBE's proposal, the court considers such an error de
minimis, and "[d]e minimis errors in the procurement process do not justify relief." See
Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.
2013). Plaintiff has further failed to establish that, absent this alleged error, the Agency
would not have assigned QBE a deficiency for Sub-Factor 1c. See id. ("The protestor
bears the burden of proving that a significant error marred the procurement in question.").
The court construes the Agency's reference to QBE's failure to identify "an IMS or other
document/visualization" as just one example of QBE's overarching failure to "clearly
identify any implementation strategy." AR 1382; see also id. (concluding that "[t]here is
no plan with [QBE's] document").

As an initial matter, the PWS sets forth a thirty-day transition timeline for Continental United States (CONUS) operations and a sixty-day transition timeline for all overseas operations (OCONUS). See AR 728 (stating that "the Contractor shall have personnel in place during transition periods after an award to ensure a successful transition" and that the "CONUS transition period is 30 days" and the "OCONUS transition period is 60 days"); Tr. 25:8–12 (Def.'s Counsel) (observing same). And although QBE claimed that it would establish program management and operations support "within 2 weeks of award," AR 1223, QBE offered no details or explanation as to how it intends to meet this timeline. Rather, QBE provided summary assurances that failed to inspire confidence in the Agency that QBE could meet the CONUS and OCONUS transition timelines with low risk to the government. Accordingly, the court finds the Agency reasonably faulted QBE for not demonstrating, in any capacity, "how [it] intend[ed] to meet timelines to get ramped up to support the PM." See AR 1382.

Plaintiff also claims that section 1.3 of QBE's proposal "clearly describes a strategy to implement the program." Pl.'s Mot. 25; Pl.'s Resp. ECF No. 21, at 6. Plaintiff argues that QBE's "implementation approach is consistent with an unfunded multiple award IDIQ vehicle," Pl.'s Resp. 7, and that "[i]t is unclear what other expectation the Government has for implementation of the [multiple award] IDIQ given that no funding will be provided at contract award, no access to Government facilities provided, no access to Government systems, no specific programs tasks to be implemented nor authorization to access Government information," id. at 8.

Notwithstanding plaintiff's contention to the contrary, the record supports the Agency's determination that QBE failed to "clearly identify any implementation strategy." See AR 1419 (CRD); accord AR 1382 (SSEB) (similar); cf. CRAssociates, 102 Fed. Cl. at 717 (stating that a protestor's mere disagreement an Agency's determination "is not nearly enough" to establish that the Agency acted unreasonably). QBE dedicated a scant three paragraphs to addressing its approach for implementing the twenty-one technical support tasks and three program management tasks. See AR 1223. This cursory presentation of information does not engender confidence that QBE "possess[es] a realistic approach and implementation strategy for meeting or exceeding the EITS IDIQ PWS requirements with low risk to the Government." See AR 803; Tr. 23:24–24:4 (Def.'s Counsel) (stating that "the [Agency] didn't have any confidence that QBE could [implement the tasks successfully]," which is "an imminently reasonable conclusion to make" based on the three paragraphs QBE offered as an implementation strategy). The court finds reasonable the Agency's determination that QBE failed to adequately explain how it intended to implement the PWS tasks within the I3C2 framework, see AR 1380 (SSEB Tech. Eval.) (finding that QBE's proposal "provided insufficient value to justify how the offeror would implement [the] technical section to the framework"), and concludes that the Agency reasonably assigned QBE a deficiency for Sub-Factor 1c. The court further finds that the Agency rationally found that curing this deficiency would require major revisions to the relevant portion of QBE's proposal.

See AR 1421 (CRD) ("Major revisions would be required to [QBE's] Technical [Proposal] for QBE's proposal to be awardable").

          c.        Sub-Factor 1d – Coordination and Planning

Section L of the Solicitation instructs offerors to describe their coordination plans under Sub-Factor 1d.  AR 795.  The Solicitation instructs offerors as follows:  "Address issues of coordination, planning and integration activities as they relate to all elements of the PWS."  Id.  Section M of the Solicitation sets forth the process by which the Agency intends to evaluate Sub-Factor 1d and provides:  "The offeror should provide evidence of sufficient planning to show that work will be accomplished as required and on schedule. The proposal should clearly articulate the plans and coordination required for all activities needed to execute the contract and satisfy the customer's requirements."  AR 803.

In its evaluation of QBE's Sub-Factor 1d, which is addressed in section 1.4 of QBE's proposal, AR 1223–24, the SSEB found that QBE "did not address any coordination and planning process (chart or table or explanation in writing) to justify any proposed position, but rather just rewrote the description from [the] PWS," AR 1382, a finding that the contracting officer considered persuasive when deciding to exclude QBE from the competitive range, AR 1419.[13]  The SSEB identified one deficiency in this section of QBE's proposal for "basically restat[ing] the PWS" and for failing to "offer any planning documents or other supporting visualization (tables, planning and process charts for their organizations.)."  AR 1382.

Section 1.4 of QBE's Technical Proposal consists of approximately one page and purports to "discuss issues of coordination and planning."  AR 1223; see also id. (indicating that section 1.4 addresses "SF1.d"—or Sub-Factor 1d).  However, this section is more accurately described as a restatement of the PWS section dedicated to Contingency Operations.  See id. (stating that section 1.4 of QBE's Technical Proposal

---

[13]      The court does not interpret the Agency's observation that QBE "did not address any coordination and planning process . . . to justify any proposed position," AR 1382, as a failure by QBE to identify certain billable or labor positions, as plaintiff would suggest, see Pl.'s Mot. 26 (claiming that QBE "did not propose any billable positions" because the Solicitation does not require offerors to do so).  Instead, the court interprets the Agency's observation to be an effort to point out a failure by QBE to identify any strategy, approach, or methodology.  See Tr. 29:8–12 (Def.'s Counsel) ("[QBE was not] downgraded because [it] didn't . . . offer a technical laborer position or some level of specificity for a billable position.  [But, rather,] [i]t's that there's no position here.  There is no approach to accomplish these tasks.").  This interpretation is consistent with Agency's criticism of other sections of QBE's proposal.  See, e.g., AR 1382 (stating that QBE failed to identify a "plan" in the section of its proposal dedicated to Sub-Factor 1c).

focuses "especially [on] how [QBE] will meet all Contingency Planning and Operations Support Requirements" (citing PWS 5.1.1 and 5.1.2 (AR 510–11)).

Plaintiff appears to argue that QBE adopted an "integrated approach" to discussing its coordination and planning process:  "Throughout the response to Sub-Factor 1 requirements (i.e. within each task area), QBE's proposal clearly provides processes which are intended to deliver a coordinated implementation of the described approach and methodology."  Pl.'s Mot. 26 (citing AR 1206–24).  As plaintiff sees it, the Agency simply "did not like the manner in which QBE organized its proposal."  Pl.'s Mot. 17; accord Tr. 15:2–8 (Pl.'s Counsel).  As support for this argument, plaintiff cites to Matter of: J.R. Conkey & Assocs., Inc. dba Solar Power Integrators (J.R. Conkey), B-406024.4, 2012 WL 3744798 (Comp. Gen. Aug. 22, 2012), in which the Government Accountability Office (GAO) found that although an agency "does not bear the responsibility of an inadequately written proposal, the agency does not have license to ignore information in a proposal that is readily apparent."  Id. at *4.

The court finds unavailing plaintiff's reliance on J.R. Conkey.  Unlike the solicitation in J.R. Conkey, which "did not require offerors to organize their proposals in any particular manner," id. at *5, the Solicitation at issue here specifically instructs offerors to "address[] each factor/sub-factor in the format and sequence identified in the solicitation," AR 791; cf. id. ("The Government will consider an offeror's noncompliance with proposal instructions to be indicative of the type of conduct that it may expect from the offeror during contract performance.").  Accordingly, plaintiff's blanket citation to the entirety of QBE's Technical Proposal dedicated to addressing Sub-Factor 1 does not serve plaintiff well here.  See Pl.'s Mot. 26 (citing AR 1206–24 as support for the proposition that "[t]hroughout the response to Sub-Factor 1 requirements (i.e. within each task area), QBE's proposal clearly provides processes which are intended to deliver a coordinated implementation of the described approach and methodology").[14]  Because QBE failed to clearly identify its coordination and planning activities within the section of its proposal that specifically purported to do so, see AR 1223, the court finds reasonable the Agency's identified deficiency for Sub-Factor 1d.  The court further finds that the Agency rationally found that curing this deficiency would require major revisions to this portion of QBE's proposal.  See AR 1421 (CRD) ("Major revisions would be required to [QBE's] Technical [Proposal] for QBE's proposal to be awardable").

---

[14]    Moreover, to the extent that plaintiff argues that other sections of QBE's Technical Proposal merely offer supplemental or additional information to the requisite responses set forth in section 1.4 of its proposal, see Tr. 16:8–24, 17:10–14 (Pl.'s Counsel), this argument is not supported by the record.

Based on the foregoing, the court concludes that the Agency's Unacceptable rating for Sub-Factor 1 of QBE's Technical Proposal was both reasonable and in accordance with the Solicitation's stated requirements and evaluation criteria.

2.      Technical Sub-Factor 2 – Sample Task Order Approach

Technical Sub-Factor 2 requires offerors to describe their approach to the Project Management Office Support Sample Task Order.[15]   The SSEB did not identify any strengths or weaknesses associated with Sub-Factor 2a (Approach and Methodology) or Sub-Factor 2c (Coordination and Planning) but did identify one deficiency associated with Sub-Factor 2b (Implementation Strategy).   Accordingly, only Sub-Factor 2b is at issue and is discussed below.

a.      Sub-Factor 2b – Implementation Strategy

Section L of the Solicitation instructs offerors to describe their implementation strategy to the Sample Task Order under Sub-Factor 2b.  AR 795.  The Solicitation specifically instructs offerors as follows:

> Describe how you intend to implement your performance of this sample task order.  Provide a detailed labor mix (your proposed labor categories with corresponding hours) utilizing the appropriate labor categories provided in the contract pricing spreadsheet required to successfully perform the sample task order.  Offerors are permitted to select any or all of the labor categories from the Master Labor Rate Table that they believe are appropriate, and to select the number of labor hours for each selected labor category that they feel are appropriate.  This detailed labor mix will not count against the page limitations.

AR 795–96.

Section M of the Solicitation provides that the Agency will use the following standards to evaluate offerors' implementation strategy Sub-Factor 2b:

> In the detailed labor mix, the offeror shall demonstrate understanding of mission, corporate, and office requirements related to [i]mplementation of capabilities.   The offeror shall demonstrate that it possesses a realistic approach and implementation strategy for meeting or exceeding the Sample Task Order 0001 PWS requirements with low risk to the Government.

---

[15]      Amendment 0022 of the Solicitation notified offerors that it would not award Project Management Office Support Task Order 0001 due to financial constraints.  AR 1408 (CRD).  The Agency treated the Task Order as a Sample Task Order, and it "remain[ed] part of the Technical and Management evaluations for overall basic contract award(s)."  Id.

Additionally, the evaluation under this Sub-[F]actor will consider the realism of the proposed labor mix (to include the offeror's proposed labor categories and associated labor hours) with respect to accomplishing the Sample Task Order 0001 PWS requirements.

AR 804.

In its evaluation of QBE's Sub-Factor 2b, which is addressed in section 2.3 of QBE's proposal, AR 1230, the SSEB found that QBE's proposal did not sufficiently explain how it planned to align its Sample Task Order implementation strategy with its approach and methodology strategy "for successful achievement of the contract on time with low risk," AR 1383. As to the identified deficiency within this section of QBE's proposal, the SSEB stated:

> [QBE] only identified senior leadership staff. Proposal offered Labor categories for the senior leadership staff which was not adequately broken out to effectively analyze. Proposal did not offer technical labor categories and related required hours for technical workforce for the PM mission as a part of critical requirement for this [Systems Engineering and Technical Assistance] contract.[16] Additionally, [p]roposal did not describe clearly the experience of the key personnel in related technical field (Contract Management Support[)] . . . in support of the proposal's implementation strategy.

Id. (footnote added). The contracting officer considered the entirety of these findings persuasive in her competitive range determination. AR 1419–20 (CRD).

Section 2.3 of QBE's proposal states in full:

> [QBE] is well positioned to provide immediate impact to I3C2. We propose key personnel with direct experience leading EITS PMOS support for Task Order #001. This allows our team to bring institutional knowledge, substantially reducing the risk to implementation for [QBE]. In support of this TO, our initial focus will consist of establishing our PMO within 2 weeks of award to meet onsite with Government representation and the incumbent PMO. Figure 2.3 illustrates our detailed labor mix (proposed labor categories with corresponding hours).

---

[16]     Plaintiff does not appear to dispute the Agency's determination that QBE failed to "offer technical labor categories and related required hours for [its] technical workforce." AR 1383 (SSEB Tech. Eval.).

| LABOR CATEGORY | HOURS |
|---|---|
| Program Manager (PGM) | 1,880 |
| Administrative Support (EAS) | 5,640 |
| Graphic Artist (GAR) | 940 |
| ILS Logistics Support – Senior (IL1) | 1,880 |
| Business Process Reengineering Senior (BP1) | 1,880 |
| Knowledge Management – Senior (KM1) | 1,880 |
| Knowledge Management – Intermediate (KM2) | 1,880 |
| Project Management Specialist Senior (PM1) | 18,800 |
| Project Management Specialist Intermediate (PM2) | 1,880 |

We will provide surge resources from our IDIQ PMO to support our Project Manager and meet with all relevant stakeholders to establish a working relationship, an understanding of expectations, and to collect all initial data. Our IDIQ PMO will assist the TO PMO with the development of an initial PMP and QCP, and leverage our corporate structures to quickly update the human resources, FSO, IT, engineering, proposal, and financial system and process structures to support the new TO requirements. Due to the proactive approach used in establishment of our IDIQ structure, our team will be well prepared to quickly ramp up and provide high quality service delivery with immediate benefits to the I3C2 program.

AR 1230.

Plaintiff first contends that section 2.3 of its proposal "provides a table defining the proposed labor categories and corresponding hours as required." Pl.'s Mot. 29. As noted above, the Solicitation advises offerors that the Agency would not count the detailed labor mix as part of the overall page limitation and that offerors could "select any or all of the labor categories from the Master Labor Rate Table that they believe are appropriate." AR 796. Of the forty-one labor categories available, see AR 1308 (QBE's Master Labor Rate Table), QBE identified nine, AR 1230. The nine labor categories identified by QBE appear to consist primarily of senior leadership staff. See AR 1230 (identifying a program manager and other "senior" and "intermediate" staff). However, as defendant's counsel observed during oral argument, whether the identified labor categories constitute QBE's senior leadership staff or technical support staff is irrelevant because "the information that was proposed by QBE was not enough for [the Agency] to . . . have any degree of confidence that this group of nine positions [was] going to be sufficient to perform these tasks." Tr. 35:22–36:3 (Def.'s Counsel). The court considers reasonable the Agency's determination that it was unable to "effectively analyze" the labor categories because they were not adequately broken down, AR 1383, and plaintiff's summary assertion that it "provide[d] a detailed and complete set of labor categories proposed to successfully perform the sample task order," does not persuade the court

otherwise, Pl.'s Mot. 29; cf. CRAssociates, 102 Fed. Cl. at 717 (stating that a protestor's mere disagreement an Agency's determination "is not nearly enough" to establish that the Agency acted unreasonably).

Plaintiff also contends that the Solicitation does not require offerors to explain how their sample task order implementation strategy aligns with their approach and methodology. Pl.'s Mot. 28. Plaintiff is technically correct, but QBE addressed the Sample Task Order PWS requirements in the approach and methodology section of its proposal. See AR 1225–29 (QBE's Proposal); cf. AR 513–18 (PWS) (discussing program management and operation requirements). And Section M of the Solicitation advises that the Agency intends to evaluate whether "[t]he offeror . . . demonstrate[s] that it possesses a realistic approach and implementation strategy for meeting or exceeding the Sample Task Order 0001 PWS requirements with low risk to the Government." AR 804. Accordingly, the court finds reasonable the Agency's examination of this factor.

Plaintiff appears to argue in the alternative that section 2.5 of QBE's proposal "provide[s] significant detail supporting the proposed implementation strategy which directly aligns with the approach and methodology." Pl.'s Mot. 29 (citing AR 1232–34 (QBE's Proposal)). However, section 2.5 of QBE's proposal addresses Sub-Factor 2c, which requires offerors to "[p]rovide a Work Breakdown Structure (WBS), WBS Dictionary, and Integrated Master Schedule (IMS) for the Sample Task Order," AR 796, and the Solicitation specifically instructs offerors to "address[] each factor/sub-factor in the format and sequence identified in the solicitation." AR 791; see supra Part III.A.1.c (addressing in more detail plaintiff's argument that the Agency simply "did not like the manner in which QBE organized its proposal"). Further, the Agency separately evaluated section 2.5 of QBE's proposal and determined that it "met the minimum requirements of the PWS." AR 1383 (SSEB Tech. Eval.). And, as defendant correctly observes, "QBE's work breakdown structures do little more than truncate and reformat the performance requirements listed in the Sub-Factor 2 PWS." Def.'s Resp., ECF No. 20, at 10. Compare AR 1232–33 (QBE's Proposal), with AR 757–62 (Amendment 0017). The court therefore finds reasonable the Agency's determination that QBE failed to adequately explain how it would synchronize its Sample Task Order implementation strategy with its approach and methodology.

Finally, the court finds reasonable the Agency's observation that QBE did not clearly describe "the experience of the key personnel in related technical field (Contract Management Support[)]." AR 1383. Plaintiff argues that the only "key personnel" the PWS requires offerors to identify is the Project Manager, and that QBE properly identified its Project Manager in section 2.1.2 of its proposal.[17] Pl.'s Mot. 29–30 (citing

---

[17]   The court observes that QBE identified the Project Manager by name only without offering any details as to his experience or qualifications. See AR 1229 (stating, in full: "[QBE's] Key Personnel for this Task Order is XXX, our Project Manager, who will be available to work under the Task Order as specified in the IETS PWS.").

AR 1229 (QBE's Proposal)); cf. AR 518 (PWS) (identifying the Project Manager as the key personnel). The court understands, however, that the Agency merely adopted the language used by QBE in its discussion of its proposed labor force: "We propose key personnel with direct experience leading EITS PMOS support for Task Order #001." AR 1230 (QBE's Proposal) (emphasis added). More to the point, the court finds that QBE's list of proposed "key personnel" offers only a cursory understanding of this requirement. The court finds that the Agency reasonably faulted QBE for failing to address, in any capacity, the pertinence and value of the experience and qualifications of its Project Manager or any other key personnel necessary to implement the PWS Contract Management Support requirement. Cf. Def.'s Resp. 10 (observing that "QBE proposes approximately nine man-years from the Project Management Specialist Senior position without offering any additional detail").

Plaintiff's view that section 2.3 of QBE's proposal "clearly provides a strategy for implementing the performance of this sample task order," Pl.'s Mot. 29, is simply not supported by the record. Although QBE states that it will "quickly ramp up" and "will be well prepared to . . . provide high quality service delivery with immediate benefits to the I3C2 program," AR 1230 (QBE's Proposal), the court agrees with defendant that QBE offers little more than "generic superlatives [that] are insufficient to demonstrate a realistic . . . implement[ion strategy]," Def.'s Resp. 10–11.

Accordingly, the court finds that the Agency reasonably assigned QBE a deficiency for Sub-Factor 2b. The court further finds that the Agency rationally found that curing this deficiency would require major revisions to this component of QBE's proposal. Cf. AR 1420 (CRD) (stating the deficiency associated with Sub-Factor 2b "[would] require major revisions to [QBE's] proposal").

Based on the above identified deficiency, the court concludes that the Agency's Unacceptable rating for Sub-Factor 2 of QBE's Technical Proposal was both reasonable and in accordance with the Solicitation's stated requirements and evaluation criteria.

B.     The Management Factor

Plaintiff also contends that the Agency improperly evaluated QBE's Management Proposal. Pl.'s Mot. 30–37; cf. AR 1399–1401 (SSEB Mgmt. Eval.) (rating QBE's Management Proposal as Marginal). However, even if the court accepted plaintiff's argument that QBE's Management Factor merited an Outstanding rating, this rating would not have overcome the Agency's decision to exclude QBE from the competitive range. As plaintiff correctly observes, "[i]t is the Unacceptable rating the Agency made under the[] two [Technical] sub-factors that caused the Agency to exclude QBE's proposal from the competitive range." Pl.'s Resp. 2; see also id. at 11 ("Obviously, if the Agency's evaluation of QBE's proposal, especially under the Technical Factor, stands[,] QBE should not be in the competitive range."); cf. AR 802 (Solicitation) (stating that the Technical Factor is the most important factor in the Agency's best value determination).

23

The court has concluded that the Unacceptable ratings assigned to both Technical Sub-Factors were reasonable, see supra Part III.A; accordingly, it need not address plaintiff's arguments regarding the Agency's evaluation of QBE's Management Proposal.

IV.     Conclusion

Further to the foregoing, and based on a thorough and careful review of the record, the court concludes that the Agency rationally rated QBE's Technical Proposal as Unacceptable and rationally excluded QBE from the competitive range.  Plaintiff's motion is therefore **DENIED**, and defendant's motion is **GRANTED**.  The Clerk of Court shall enter judgment for the government.  No costs.

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge
